

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| DDH OPERATING, LTD. d/b/a DDH AVIATION and 448 ALLIANCE, LLC, <br><br> Plaintiffs, <br><br> *vs.* <br><br> PLATINUM JET MANAGEMENT, LLC, PLATINUM INVESTMENT GROUP, LLC, PRESTIGE JET MANAGEMENT, LLC, PAUL BRASSINGTON, MICHAEL BRASSINGTON, ANDRE BUDHAN, SHEILAGH CIRILLO, GLOBAL AEROSPACE, INC., GLOBAL AEROSPACE (NORTH AMERICA), INC., GLOBAL AEROSPACE SYSTEMS, INC., NATIONAIR INSURANCE AGENCIES, INC., NATIONAIR INSURANCE AGENCIES, LTD., NATIONAIR INSURANCE, LTD., JEFF GRAY, and CITICORP USA, INC. <br><br> Defendants. | § § § § § § § § § § § § § § § § § § § § § § § § § § | CIVIL ACTION NO. 3:05-CV-00499-H <br><br>  <br><br> JURY TRIAL REQUESTED |

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR
INTERPLEADER, DECLARATORY RELIEF, and DAMAGES
and REQUEST FOR JURY TRIAL**

**COME NOW** DDH Operating, Ltd. d/b/a DDH Aviation and 448 Alliance, LLC as

Plaintiffs herein, and, pursuant to the Local Rules of the United States District Court for the

Northern District ("Local Rules") and the Federal Rules of Civil Procedure, Rule 22, files and

serves this Plaintiffs' First Amended Complaint for Interpleader, Declaratory Relief, and

Damages and Request for Jury Trial ("Complaint"), and, for causes of action, Plaintiffs

respectfully show unto the Court as follows:

## I.
## PARTIES and SERVICE

¶1    DDH Operating, Ltd. d/b/a DDH Aviation ("DDH"), is a Texas limited partnership with its principal place of business in Dallas, Texas.

¶2    448 Alliance, LLC ("448") is a Delaware limited liability company owned by DDH with its principal place of business in Dallas, Texas.    DDH and 448 are referred to collectively as "Plaintiffs."

¶3    Paul Brassington is a resident of Fort Lauderdale, Florida.

¶4    Michael Brassington is a resident of Fort Lauderdale, Florida.

¶5    Andre Budhan is a resident of Fort Lauderdale, Florida.

¶6    Sheilagh Cirillo is a resident of Fort Lauderdale, Florida.

¶7    Platinum Jet Management, LLC ("Platinum Jet") is a Florida corporation with its principal place of business at 1715 NW 51st Place, Hangar #70, in Fort Lauderdale, Florida 33309.

¶8    Platinum Investment Group, LLC ("Platinum Investment") is a Florida corporation with its principal place of business at 1715 NW 51st Place, Hangar #70, in Fort Lauderdale, Florida 33309.

¶9    Prestige Jet Management, LLC ("Prestige") is a Florida corporation with its principal place of business at 1715 NW 51st Place, Hangar #70, in Fort Lauderdale, Florida 33309.

¶10    Complainants refer to Platinum Jet, Platinum Investment, and Prestige collectively, as "Platinum," unless otherwise indicated.

¶11    There exists between Paul Brassington, Michael Brassington, Andre Budhan, and Sheilagh Cirillo, on the one hand, and Platinum, on the other, such a unity that the separateness

of these individuals and Platinum has ceased. Accordingly, it would result in injustice to Plaintiffs for this Court to treat each individual and entity as distinct from the others.

¶12    Further, Paul Brassington, Michael Brassington, Andre Budhan, and Sheilagh Cirillo have organized and operated Platinum as a mere tool or business conduit for themselves. They thus have used Platinum as part of a basically unfair device to achieve inequitable results at Plaintiffs' expense.

¶13    Global Aerospace, Inc. ("Global Aerospace") is a New Jersey corporation with its principal place of business at 3 Van Hise Drive in Perrineville, New Jersey 08535.

¶14    Global Aerospace (North America), Inc. ("Global North America") is a New Jersey corporation with its principal place of business at 51 JFK Parkway, 5th Floor, in Short Hills, New Jersey 07078.

¶15    Global Aerospace Systems, Inc. ("Global Systems") is a New Jersey corporation with its principal place of business at 237 Christopher Drive, in Princeton, New Jersey 08540.

¶16    Complainants refer to Global Aerospace, Global North America, and Global Systems collectively, as "Global," unless otherwise indicated.

¶17    There exists between Global Aerospace, Global North America, and Global Systems such a unity that the separateness of these entities has ceased. Accordingly, it would result in injustice to Plaintiffs for this Court to treat each as an entity distinct from the others.

¶18    Further, Global Aerospace, Global North America, and Global Systems have organized and operated each other as mere tools or business conduits for themselves. Global Aerospace, Global North America, and Global Systems thus have used each other as part of a basically unfair device to achieve inequitable results at Plaintiffs' expense.

¶19    NationAir Insurance Agencies, Inc. is a Missouri corporation with its principal place of business at 595 Bell Avenue in Chesterfield, Missouri William Schroeder, 595 Bell Avenue, Chesterfield, Missouri 63005.

¶20    NationAir Insurance Agencies, Ltd. is a Missouri corporation with its principal place of business at 595 Bell Avenue in Chesterfield, Missouri William Schroeder, 595 Bell Avenue, Chesterfield, Missouri 63005.

¶21    NationAir Insurance, Ltd. is a Missouri corporation with its principal place of business at 595 Bell Avenue in Chesterfield, Missouri William Schroeder, 595 Bell Avenue, Chesterfield, Missouri 63005.

¶22    Complainants refer to NationAir Insurance Agencies, Inc., NationAir Insurance Agencies, Ltd., and NationAir Insurance, Ltd. collectively, as "NationAir," unless otherwise indicated.

¶23    There exists between NationAir Insurance Agencies, Inc., NationAir Insurance Agencies, Ltd., and NationAir Insurance, Ltd. such a unity that the separateness of these entities has ceased. Accordingly, it would result in injustice to Plaintiffs for this Court to treat each as an entity distinct from the others.

¶24    Further, NationAir Insurance Agencies, Inc., NationAir Insurance Agencies, Ltd., and NationAir Insurance, Ltd. have organized and operated each other as mere tools or business conduits for themselves. NationAir Insurance Agencies, Inc., NationAir Insurance Agencies, Ltd., and NationAir Insurance, Ltd. thus have used each other as part of a basically unfair device to achieve inequitable results at Plaintiffs' expense.

¶25    Jeff Gray is a resident of Seattle, Washington.

¶26 Citicorp USA, Inc. is Delaware corporation with its principal place of business at Citicorp Center, 601 Lexington Avenue, New York City, New York 10022-6004.

## II.
## JURISDICTION and VENUE

**A.** **Jurisdiction.**

**1.** **Subject Matter Jurisdiction.**

**a.** **Federal Question.**

¶27 This Court has "diversity" subject matter jurisdiction as to this lawsuit pursuant to 28 U.S.C. §1332. Section 1332 provides: "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between – [. . .] citizens of different states." *See* 28 U.S.C.A. §1332(1).

**b.** **Pendent Jurisdiction.**

¶28 This Court has "pendent" subject matter jurisdiction as to any remaining state law claims pursuant to 28 U.S.C. §1367. Section §1367 provides:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

*See* 28 U.S.C. §1367(a); *see also* 28 U.S.C. §1367(b).

**2.** **Personal Jurisdiction.**

¶29 This Court has personal jurisdiction as to all parties named as defendants because the breaches, criminal acts, and/or torts they have committed occurred, in part or whole, in Texas.

¶30    This Court has personal jurisdiction as to all parties named as defendants because the breaches, criminal acts, and/or torts they have committed occurred, in part or whole, in Texas. Although citizens and residents of other states, they have "purposefully directed" their activities at residents of this forum and this lawsuit results from Plaintiffs' injuries, which "arise out of or relate to" their purposefully directed activities.

### 3.    Interpleader Jurisdiction.

¶31    This Court has interpleader jurisdiction as to this lawsuit pursuant to Fed. R. Civ. P. 22 because Platinum is of diverse citizenship, as defined by 28 U.S.C. §1332, is claiming to be entitled to at least $7 million in proceeds of an insurance policy at (the Liability Policy No. MAP 412241 (the "Policy")), as to which proceeds in their entirety DDH claims a superior right of control and ownership. Plaintiffs attach hereto a true and correct copy of the Policy as Exhibit "1." The specific parties claiming an interest in the proceeds of the Policy are:

(1)    Plaintiffs;
(2)    Platinum; and
(3)    Citicorp USA, Inc. ("Citicorp").

¶32    DDH acts herein on behalf of Citicorp, which may or may not decide to intervene at some later date. Citicorp resides, in part, in Dallas.

### B.    Venue.

¶33    This Court is a proper venue for this lawsuit and these parties pursuant to 28 U.S.C. §1397. Section 1397 provides that an interpleader action "may be brought in the judicial district in which one or more of the claimants reside.

¶34    A substantial part of the events or omissions giving rise to the claims that Plaintiffs allege herein occurred within the Northern District of Texas.

## III.
## SERVICE

¶35    Plaintiffs can and do serve Platinum Jet by and through its Registered Agent, Selwyn P. Gordon, 5470 NW 114th Avenue, Apt. 104, in Miami, Florida 33178.

¶36    Plaintiffs can and do serve Platinum Investment by and through its Registered Agent, Corporate Creations Network, Inc., 11380 Prosperity Farms Road, #221E, in Palm Beach Gardens, Florida 33410.

¶37    Plaintiffs can and do serve Prestige by and through its Registered Agent, Corporate Creations Network, Inc., 11380 Prosperity Farms Road, #221E, in Palm Beach Gardens, Florida 33410.

¶38    Plaintiffs can and do serve Paul Brassington at his place of business at place of business at 1715 NW 51st Place, Hangar #70, in Fort Lauderdale, Florida 33309.

¶39    Plaintiffs can and do serve Michael Brassington at his place of business at place of business at 1715 NW 51st Place, Hangar #70, in Fort Lauderdale, Florida 33309.

¶40    Plaintiffs can and do serve Andre Budhan at his place of business at place of business at 1715 NW 51st Place, Hangar #70, in Fort Lauderdale, Florida 33309.

¶41    Plaintiffs can and do serve Sheilagh Cirillo at his place of business at place of business at 1715 NW 51st Place, Hangar #70, in Fort Lauderdale, Florida 33309.

¶42    Plaintiffs can and do serve Global Aerospace, by and through its Registered Agent, Lynn S. Diamant at 3 Van Hise Drive in Perrineville, New Jersey 08535.

¶43    Plaintiffs can and do serve Global North America, by and through its Registered Agent, Prentice-Hall Corp. Sys., 830 Bear Tavern Road, Trenton, New Jersey 08628.

¶44    Plaintiffs can and do serve Global Systems, by and through its Registered Agent, Paul Sharma Surinder , 237 Christopher Drive, Princeton, New Jersey 08540.

¶45    Plaintiffs can and do serve NationAir Insurance Agencies, Inc., by and through its Registered Agent, William Schroeder, 595 Bell Avenue, Chesterfield, Missouri 63005.

¶46    Plaintiffs can and do serve NationAir Insurance Agencies, Ltd., William Schroeder, 595 Bell Avenue, Chesterfield, Missouri 63005.

¶47    Plaintiffs can and do serve NationAir Insurance, Ltd., William Schroeder, 595 Bell Avenue, Chesterfield, Missouri 63005.

¶48    Plaintiffs can and do serve Jeff Gray at his place of business at 7001 Perimeter Road South, Seattle, Washington 98108.

Plaintiffs can and do serve Citicorp through its registered agent, CT Corporation System at 350 North Saint Paul Street, Dallas, Texas 75201.

## IV.
## FACTS

¶49    DDH is an aircraft dealer and broker. From time to time, DDH also leases aircraft. DDH does not supply pilots, maintenance, or fuel. These are provided by the lessees.

¶50    In the fall of 2000, DDH purchased a Challenger 600 (Serial Number 1022) jet aircraft from the Canadian government for approximately $3.75 million (the "Challenger 1022").

¶51    In the fall of 2000, DDH purchased a Challenger 600 (Serial Number 1014) jet aircraft for approximately $3.75 million (the "Challenger 1014").

¶52    The Challengers 1014 and 1022 required "demodification" before they could obtain certificates of airworthiness from the Federal Aviation Administration ("FAA") to fly within the United States, as U.S.-based aircraft.

¶53    Further, the Challengers had been operated by the Canadian military and, accordingly, were not suitable for jet aircraft leasing to civilians. DDH incurred approximately $2.8 million, per Challenger, in interior/exterior modification and maintenance.

¶54 Further, as to both jet aircraft, DDH incurred approximately $500 thousand in maintenance service program ("MSP") enrollment costs.

¶55 On September 2, 2003, 448 leased Challenger 1014 to Platinum (the "Challenger 1014 Lease"). The lease was to expire on August 8, 2004. The parties agreed, however, that either party could terminate the Challenger 1014 Lease on a month-to-month basis. Plaintiffs attach hereto a true and correct copy of the Challenger 1014 Lease as Exhibit "2."

¶56 Platinum specifically represented (in writing) to 448 that, as to the Challenger 1014, it:

(1) Was a duly organized business organization in good standing under its place of employment;
(2) Had the authority to enter the Challengers 1014 Lease;
(3) Had provided a true and correct financial statement as part of the Challenger 1014 Lease;
(4) Would not operate Challenger 1014 "in any manner which would contravene the uses and purposes stipulated in the insurance policies discussed" in the Challenger 1014 Lease;
(5) Would provide proof of insurance reflecting that DDH and one of its primary lenders, Citicorp, were additional insureds as to any policies concerning Challenger 1014;
(6) Would further name Citicorp "sole loss-payee" as to policies concerning Challenger 1014;
(7) Would not violate any FAA rules or regulations (or any comparable state rules and regulations);
(8) Would make all MSP amounts and landing fees for Challenger 1014; and
(9) Would not make any change as to insurance coverage without DDH's consent.

¶57 On November 25, 2003, DDH and Citicorp entered a security agreement and chattel mortgage regarding Challengers 1014 and 1022 (the "Challengers Security Agreement"). Under the terms of the Challengers Security Agreement, DDH granted Citicorp a secured interest in Challengers 1014's and 1022's "airframe." DDH granted Citicorp this interest in connection with Citicorp's extension of $50,500,000.00 in credit.

¶58    In addition to granting Citicorp a secured interest in Challengers 1014 and 1022, DDH committed, "to all times carry and maintain, or cause to be carried and maintained, with financially sound and reputable insurers," insurance as to the jet "in such amounts and against such risks as is usual and customary in the case of entities of established reputations engaged in the same or similar business as that of" DDH. DDH committed to providing airframe (or "hull") insurance and $50 million in comprehensive liability insurance.

¶59    DDH further committed to Citicorp that all such insurance would be payable to Citicorp.

¶60    On August 8, 2004, the Challenger 1014 Lease expired by its terms. The parties – 448 and Platinum – agreed, however, to continue the Lease indefinitely, subject to the same terms.

¶61    Accordingly, thereafter, Platinum continued to make insurance and lease payments in accordance with the Challenger 1014 Lease.

¶62    On November 1, 2004, DDH leased Challenger 1022 to Platinum (the "Challenger 1022 Lease"). This lease was a "lease-purchase" agreement. The lease was to expire on November 1, 2005. The parties agreed, however, that either party could terminate the Challenger 1022 Lease on a month-to-month basis. Plaintiffs attach hereto a true and correct copy of the Challenger 1022 Lease as Exhibit "3."

¶63    Platinum specifically represented (in writing) to 448 that, as to the Challenger 1022, it:

    (1)    Was a duly organized business organization in good standing under its place of employment;
    (2)    Had the authority to enter the Challengers 1022 Lease;
    (3)    Would pay rent monthly in the amount of $46,321.04;
    (4)    Had provided a true and correct financial statement as part of the Challenger 1014 Lease;

(5)     Would not operate Challenger 1014 "in any manner which would contravene the uses and purposes stipulated in the insurance policies discussed" in the Challenger 1014 Lease;

(6)     Would provide proof of insurance reflecting that 448 and one of its primary lenders, Citicorp, were additional insureds as to any policies concerning Challenger 1014;

(7)     Would further name Citicorp "sole loss-payee" as to policies concerning Challenger 1014;

(8)     Would not violate any FAA rules or regulations (or any comparable state rules and regulations);

(9)     Would pay all MSP amounts and landing fees for Challenger 1014; and

(10)    Would not make any change as to insurance coverage without 448's consent.

¶64     As of this date, Platinum was fully aware that DDH was the grantor of security interests in both Challengers 1014 and 1022, that Platinum had a duty to obtain insurance naming Citicorp as the sole loss payee on all insurance policies pertaining to these two jet aircraft (as to Hull insurance), and a further duty to obtain such insurance naming both Citicorp and 448 as additional and/or named insureds.

¶65     In short, Platinum knew that Plaintiffs' ability to engage in its business was predicated, in part, with Platinum's adherence to the terms of both the Challenger 1014 Lease and the Challenger 1022 Lease.

¶66     By the end of November 2004, Platinum had failed to pay DDH – as obligated by the terms of the Challenger 1022 Lease – approximately $5.5 thousand in MSP amounts and landing fees.

¶67     By the end of December 2004, Platinum had failed to pay DDH – as obligated by the terms of the Challenger 1022 Lease – approximately $6.5 thousand in MSP amounts and landing fees.

¶68     On January 21, 2005, Platinum obtained insurance from Global, who is the insurer under the terms of the Policy.

¶69    The Policy contained two components of insurance: (1) $7 million in airframe insurance (the "Hull Insurance"); and (2) $50 million in comprehensive liability insurance (the "General Liability Insurance"), as per the terms of the Challengers 1014 and 1022 Leases, Platinum identified DDH as the payee regarding the $7 million in Hull Insurance.[1]

¶70    The Policy was to expire on January 21, 2006.

¶71    By the end of January 2005, Platinum had failed to pay DDH (and/or on behalf of DDH) – as obligated by the terms of the Challenger 1022 Lease – approximately $20 thousand in MSP amounts and landing fees. Further, Platinum failed to pay the rent as to Challenger 1022 for the month ($46,321.04).

¶72    On February 2, 2005, Challenger 1014 crashed at Teterboro Airport, in New Jersey. The crash resulted in severe injuries to at least one individual, serious injuries to a number of individuals, and a total loss as to Challenger 1014.

¶73    That same day, NationAir faxed to Plaintiffs' two certificates of insurance, one reflecting that Platinum previously had named Plaintiffs as a payee for the Hull Insurance, and the other reflecting that Platinum had named DDH as a "named insured" for purposes of Hull Insurance. Plaintiffs attach hereto true and correct copies of the certificates as Exhibits "4" and "5," respectively.

¶74    On February 8, 2005, Plaintiffs forwarded to NationAir and/or Global a waiver of its "right to receive physical damage proceeds" under the policy, subject to Global's payment to Citicorp of all such proceeds. Plaintiffs did so pursuant to NationAir's request, acting as Global's agent.

¶75    On February 8, 2005, Platinum forwarded to NationAir and/or Global an identical waiver of its "right to receive physical damage proceeds" under the policy, subject to Global's

---

[1]    Actually, Platinum named 448 as the payee. For purposes of this litigation, the distinction is not important.

payment to Citicorp of all such proceeds. Since this date, Global, NationAir, and Platinum have pretended that the waiver either does not exist or somehow has been revoked.

¶76    Finally, on February 18, 2005, DDH made a written demand for "prompt payment of the insured value in the amount of $7,000,000.00." DDH specifically advised that the amount should be paid to Citicorp as the sole loss payee. In the same correspondence, DDH specifically advised NationAir, "you are hereby notified that DDH is continuing to incur bank charges until such time that the insurance proceeds are paid to Citicorp. Thus, it is imperative that prompt payment is made to Citicorp for the insured value."

¶77    By the end of February 2005, Platinum had failed to pay DDH (and/or on behalf of DDH) – as obligated by the terms of the Challenger 1022 Lease – approximately $31 thousand in MSP amounts and landing fees. Further, Platinum failed to pay the rent as to Challenger 1022 for the first two months of 2005 (+/-$92 thousand).

¶78    After the crash in Tetersboro, the FAA – in connection with the National Transportation Safety Board ("NTSB") investigation into the crash – determined that Platinum did not have a "Part 135 Certificate," which is a federally-required certificate of operations for charter aircraft operators.

¶79    Further, Platinum declined to produce documentation, in response to a FAA subpoena, regarding training, duty time, and pilot and mechanic salaries.

¶80    By early March 2005, the FAA grounded Platinum.

## V.
## INTERPLEADER, DECLARATORY RELIEF and CLAIMS

¶81    Plaintiffs incorporate by reference the factual allegations contained in ¶¶1-78, above.

**A.    Interpleader Relief.**

   **(1)    Property.**

¶82    The property subject to interpleader is the Hull Insurance proceeds of the Policy.

¶83    The value of the property is $7 million.

   **(2)    Competing Claims.**

¶84    Platinum asserts multiple claims asserted against the property subject to this interpleader. Citicorp has a right to the property subject to this interpleader and may assert a claim herein. Global contends that it may have to pay a portion of the proceeds to Platinum.

¶85    The parties' interests in the proper subject to this interpleader are adverse. Plaintiffs claim they are entitled to the full amount of the Hull Insurance, to the extent that they must pay this amount immediately to Citicorp. Platinum contends the replacement value of Challenger 1014 is $4.5 million and that the remaining $2.5, therefore, belongs to Platinum. Global contends that it may have to pay a portion of the proceeds to Platinum.

   **(3)    Interpleader.**

¶86    Plaintiffs have a reasonable fear of multiple liability because of these adverse claims.

¶87    For these reasons, Plaintiffs request that the Court:

   (1)    Order Global to pay the full proceeds of the Hull Insurance into the registry of the Court;
   (2)    Restrain each claimant from instituting an action in any other forum against Plaintiffs relating to claims for the Hull Insurance; and

    (3)    Award Plaintiffs their reasonable costs and attorneys' fees incurred in connection with this interpleader.

**B.**    <u>**Declaratory Relief.**</u>

¶88    Plaintiffs bring this claim for declaratory judgment under the Federal Rules of Civil Procedure, Rule 57, and 28 U.S.C. §§2201 and 2202.

¶89    Plaintiffs seek declaratory judgments that:

(1)    The terms of the Policy entitle Plaintiffs to the full amount of the proceeds of Hull Insurance;

(2)    Under the terms of the Challenger 1014 Lease, Platinum owe Plaintiffs the full amount of the proceeds of the Policy as to Hull Insurance;

(3)    Under the terms of the month-to-month contract as to Challenger 1014, Platinum owes Plaintiffs the full amount of the proceeds of the Policy as to Hull Insurance; and

(4)    Global must pay the full proceeds of the Policy to Plaintiffs with respect to Hull Insurance;

(5)    The law estops Global to pay any portion of the Hull insurance to Platinum;

(6)    Platinum owes Plaintiffs back rent, MSP, and landing fees as to both Challengers 1014 and 1022; and

(7)    The law estops Platinum from asserting any right to change an additional and/or named insured as to the Policy.

**C.**    <u>**Claims.**</u>

    **1.**    <u>**Contract and Quasi-Contract.**</u>

¶90    Under Texas law, the requirements of a valid contract are: (1) offer; (2) acceptance in strict compliance with offer; (3) meeting of minds; (4) each party's consent to terms; and (5) execution and delivery of contract with intent it be mutual and binding. The elements of written and oral contracts are the same and must be present for a contract to be binding.

    **a.**    <u>**Policy.**</u>

¶91    Global made an offer to Plaintiffs and Platinum to issue it a policy of insurance in exchange for the payment of premiums. Plaintiffs and Platinum accepted Global's offer. There

was a meeting of the minds among the parties and the parties were in agreement as to the terms of this contract. In particular, DDH or 448 were and are additional insureds and/or a named insured under the Policy. Global executed and delivered the Policy.

¶92     A policy of insurance is a contract. Plaintiffs have made a demand to Global for the proceeds of the Policy as to Hull Insurance. Global has refused to make such a payment to Plaintiffs. Therefore, Global is in breach of contract.

¶93     Plaintiffs have suffered three types of damages as a result of Global's breach:

(1)     Damages in the amount of the contract – $7 million;
(2)     Consequential damages; and
(3)     Reasonable costs and attorneys' fee.

### b.     Challenger 1014 Lease.

¶94     448 offered to lease Challenger 1014 subject to certain terms. Platinum accepted 448's offer. There was a meeting of the minds and among the parties and the parties were in agreement as to the terms of this contract. In particular, Platinum was to ensure that Citicorp and 448 were additional insureds and/or a named insureds under the Policy. Platinum executed and delivered the Challenger 1014 Lease.

¶95     A lease is a contract. Platinum breached this contract by failing to obtain proper insurance and/or by refusing to pay to 448 insurance that it had obtained.

¶96     Plaintiffs have suffered three types of damages as a result of Platinum's breach:

(1)     Damages in the amount of the contract - $7 million;
(2)     Consequential damages; and
(3)     Reasonable costs and attorneys' fee.

### c.     Challenger 1022 Lease.

¶97     DDH offered to lease Challenger 1022 subject to certain terms. Platinum accepted DDH's offer. There was a meeting of the minds and among the parties and the parties were in

agreement as to the terms of this contract. In particular, Platinum was to pay rent, MSP amounts, maintenance, and landing fees. Platinum executed and delivered the Challenger 1022 Lease.

¶98     A lease is a contract. Platinum breached this contract by failing to pay rent, MSP amounts, and landing fees.

¶99     DDH has suffered three types of damages as a result of Platinum's breach:

(1)     Damages in the amount of the contract;
(2)     Consequential damages; and
(3)     Reasonable costs and attorneys' fee.

### d.     Oral Agreement.

¶100     Should this Court hold that the written version of the Challenger 1014 Lease is, in any respect, invalid, DDH shall prove that there exited among the parties an oral agreement to the same terms. Again, DDH offered to lease Challenger 1014 subject to certain terms. Platinum accepted DDH's offer. There was a meeting of the minds and among the parties and the parties were in agreement as to the terms of this contract. In particular, Platinum was to ensure that Citicorp and DDH were additional insureds and/or a named insureds under the Policy. Platinum performed under the terms of the Challenger 1014 Lease, such conduct evidencing the existence of the contract.

### e.     Broker Agreement.

¶101     Under the terms of oral agreement between Plaintiffs and Jeff Gray, Plaintiffs offered to execute a waiver of its rights to the insurance monies pertaining to Hull Insurance, under the Policy, with the understanding that Global would then pay Citicorp. Global accepted Plaintiffs' offer, by and through NationAir, and Gray, who are agents of Global. Further, and should Global deny their agency, they independently accepted Plaintiffs' offer. There was a meeting of the minds and among the parties and the parties were in agreement as to the terms of

this contract. In particular, NationAir was to ensure that Citicorp received the Hull Insurance proceeds under the Policy.

¶102    DDH has suffered three types of damages as a result of Gray's breach:

(1)    Damages in the amount of the contract – $7 million;
(2)    Consequential damages; and
(3)    Reasonable costs and attorneys' fee.

### f.    Quasi-Contract.

¶103    Plaintiffs plead for equitable relief under the doctrines of unjust enrichment and quasi-contract. These equitable doctrines allow for recovery of damages to prevent a party from obtaining a benefit from, among other things, fraud, unjust enrichment, or because of an undue advantage.

¶104    Because of Platinum's misconduct – amounting to fraud, among other claims – it has achieved an unjust enrichment at Plaintiffs' benefit. Further, Platinum's chummy relationship with Global has given it an unjust advantage over DDH.

### 2.    Tort.

### a.    Conspiracy.

¶105    Each of Defendants participated in a "civil conspiracy" to injure Plaintiffs because Defendants, in various combinations, knowingly (and by way of a meeting of the minds) combined to accomplish unlawful purposes by unlawful means.

¶106    Further, when a third party knowingly participates in a breach of fiduciary duty, a constructive fraud, and/or a fraud, under Texas law, the third party becomes a joint tortfeasor and is liable as such. To the extent that any Defendant knowingly participated in any of the other Defendant's tortious conduct, such Defendant also is liable.

¶107   Therefore, each of the Defendants is liable and responsible for the acts performed and damages caused by each of the other Defendants.

### b.   Disregard of Corporate Fiction.

¶108   Paul Brassington, Michael Brassington, Andre Budhan, and Sheilagh Cirillo operated the three Platinum entities as shams to perpetrate a fraud or series of frauds on Plaintiffs.

¶109   Therefore, each of these individual Defendants is liable and responsible for the acts performed and damages caused by each of the Platinum entities.

¶110   The management of the Global entities, as well as that of NationAir, operates them as shams to perpetrate a fraud or series of frauds, in this case on Plaintiffs.

¶111   Therefore, each of these individual Defendants is liable and responsible for the acts performed and damages caused by each of the Global entities, as well as NationAir.

### c.   Joint and Several.

¶112   Each of Defendants is jointly and severally liable as to the damages alleged herein.

### d.   Constructive Fraud.

¶113   Constructive fraud is the breach of a legal or equitable duty that the law declares fraudulent because it violates a fiduciary relationship. Plaintiffs entrusted a multi-million dollar jet into the care Platinum, who made specific representations as to its worthiness as a lessee of such a valuable and significant chattel. As such, the law should hold Platinum to the highest standard of care, that of a fiduciary.

¶114    Platinum's conduct, described herein, constitutes a breach of its fiduciary duty to DDH, which breach is the producing and proximate cause of injury to Plaintiffs, which injury is subject to economically measurable damages in an amount no less than $12 million.

###### e.      **Conversion.**

¶115    Platinum has converted to items of property belonging to Plaintiffs, subject to the secured interests of Citicorp: Challengers 1014 and 1022. Platinum has exercised control and dominion over these jet aircraft without Plaintiffs' consent and to the exclusion of Plaintiffs' superior right of possession and use.

¶116    Platinum's conduct is the producing and proximate cause of injury to Plaintiffs, which injury is subject to economically measurable damages in an amount no less than $12 million.

###### f.      **Equitable and Promissory Estoppel.**

¶117    Platinum promises to obtain insurance and then, after the crash in Tetersboro, to execute a waiver of its claim to the proceeds of the Hull Insurance component of the Policy. Had Plaintiffs known of Platinum's failure, it would have obtained insurance of its own or terminated the Challenger 1014 Lease. Instead, Plaintiffs relied on Platinum's promise, which reliance was not merely foreseeable but also inevitable.

¶118    Platinum's breach of this relied upon promise has resulted in a substantial detriment to Plaintiffs: the total loss of Challenger 1014.

¶119    Platinum's conduct is the producing and proximate cause of injury to Plaintiffs, which injury is subject to economically measurable damages in an amount no less than $12 million.

      **g.**      <u>**Fraud.**</u>

¶120    Global, NationAir, and Platinum made numerous, false, material representations that either were known to be false when made or were made without knowledge of their truth. Global, NationAir, and Platinum intended for Plaintiffs to act upon these representations. Plaintiffs did act upon – in fact, rely upon – these representations, misrepresentations, and material omissions. The conduct and statements of Global, NationAir, and Platinum caused Plaintiffs injury.

¶121    Global, NationAir, and Platinum's conduct is the producing and proximate cause of injury to Plaintiffs, which injury is subject to economically measurable damages in an amount no less than $12 million.

      **h.**      <u>**Tortious Interference with Business Relations.**</u>

¶122    Global, NationAir, and Platinum were fully aware of the important financial relationship between Plaintiffs and Citicorp. By failing to ensure that Citicorp received the proceeds of the Hull Insurance component of the Policy, they have injured that business relationship.

¶123    Global, NationAir, and Platinum's conduct is the producing and proximate cause of injury to Plaintiffs, which injury is subject to economically measurable damages in an amount no less than $12 million.

**VI.**
**TEMPORARY INJUNCTIVE RELIEF**

¶124    Plaintiffs incorporate by reference the factual allegations contained in ¶¶1-119, above.

¶125    Plaintiffs attach hereto a true and correct copy of the affidavit of Dennis Debo (the "Debo Affidavit") as Exhibit "5."

¶126    The Debo Affidavit evidences that DDH will suffer immediate and irreparable injury if Platinum is not immediately restrained from altering, destroying, or withholding from DDH manuals and records that it has within its possession pertaining to Challenger 1022. DDH has no adequate remedy at law, other than relief by temporary order of restraint, should Platinum alter, destroy, or otherwise withhold these documents.

¶127    The injury at issue is this: DDH seeks return of its jet aircraft, Challenger 1022. DDH believes it may be able to regain control and possession of the aircraft without this Court's intervention. Without the manuals and records, however, DDH will not be able to operate the multi-million dollar jet aircraft. Accordingly, DDH must have control and possession of these materials or lose all the revenue associated with the operation of Challenger 1022. Failure to generate these revenues may cause DDH to become in violation of its agreements with Citicorp.

¶128    There is a substantial likelihood that DDH will prevail on the merits: Challenger 1022 is DDH's; the documents at issue belong to DDH as well.

¶129    The likelihood of severe economic consequences completely outweighs the ransom value – which is the only value these documents have if Platinum holds them hostage – because they are of no value to Platinum if DDH has control and possession of Challenger 1022.

¶130    Issuance of a temporary restraining order is in the public's interest. The FAA has grounded Platinum for operating a charter aircraft business without proper certification and/or documentation. Further, Platinum already has destroyed one of DDH's jets and refused to turn over the insurance proceeds associate therewith. Removing from Platinum's hands any instruments of flight only can benefit the public.

¶131    DDH agrees to pay a bond in an amount the Court deems appropriate.

¶132   DDH urges the Court to set its request for temporary relief for hearing at the earliest time possible.

¶133   For these reasons, DDH moves the Court to issue a temporary restraining order preventing Platinum from altering, destroying, or withholding the manuals and records pertaining to Challenger 1022.

## VII
## DAMAGES

¶134   Plaintiffs incorporate by reference the factual allegations contained in ¶¶1-129.

¶135   Plaintiffs seek interpleader and declaratory relief.

¶136   Plaintiffs seek actual, including consequential, damages.

¶137   Plaintiffs seek prejudgment and post-judgment interest.

¶138   Plaintiffs seek reasonable costs and attorneys' fees.

¶139   Plaintiffs seek exemplary damages in an amount to be specified upon discovery in this matter.

## VIII.
## JURY REQUEST

¶140   Plaintiffs request that the Court empanel a jury to decide all questions of fact raised in this lawsuit.

## X.
## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs, DDH Operating, Ltd. and 448 Alliance, LLC urge the Court to set this matter for trial without delay, resolve all preliminary issues of law, empanel a jury to hear all issues of fact, and enter a judgment for Plaintiffs including all actual damages, attorneys' fees, costs, exemplary damages, and expenses.

Respectfully Submitted,

**SUMNER, SCHICK, HAMILTON, & PACE, PPC**

By: _____
Steve Sumner
State Bar No. 19508500
Rebecca E. Hamilton
State Bar No. 08837050
Andrew Jee
State Bar No. 24047532

3838 Oak Lawn Avenue, Suite 400
Dallas, Texas 75214
      Tel.:   (214) 965-9229
      Fax.:  (214) 965-9215

**ATTORNEYS FOR PLAINTIFFS,
DDH OPPERATING, LTD. and
448 ALLIANCE, LLC**




# GLOBAL AEROSPACE

# ManagAir Policy

THROUGH

## GLOBAL AEROSPACE, INC.

HOME OFFICE:              51 JOHN F. KENNEDY PARKWAY
                         SHORT HILLS, NEW JERSEY  07078

LOS ANGELES OFFICE:       21650 OXNARD STREET
                         SUITE 1550
                         WOODLAND HILLS, CALIFORNIA 91367

FOR

# PLATINUM JET MANAGEMENT

ARRANGED BY:

## NATIONAIR INSURANCE AGENCY
### 7001 PERIMETER ROAD, SUITE 101
### SEATTLE, WA  98108

EXHIBIT
1

# GUIDE TO THE MORE IMPORTANT PROVISIONS OF YOUR POLICY

This guide has been prepared to help you in reading your policy. It is not a part of the policy nor does it make reference to all of the provisions which might affect your insurance. You are therefore urged to read the entire policy carefully.

## DECLARATIONS

Named Insured     i

Policy Period     i

Limits of Company's Liability     ii

Description of Insured Aircraft, Insured Value     v

Aircraft Use     vi

Pilots     vi

Premium     vi

## PART I - LIABILITY COVERAGES

Coverage A - Liability for Scheduled Aircraft     1

Coverage B - Liability for Temporary Substitute Aircraft     1

Coverage C - Liability for Non-Owned Aircraft     2

Coverage D - Liability for Damage to Aircraft that are Not Owned     3

Coverage E - Liability for Damage to Aircraft Hangars     4

Coverage F - Liability for Damage to Personal Effects     4

Coverage G - Liability Arising out of the Use of Airport Premises     4

Coverage H - Liability for Sale of Aircraft, Aircraft Parts or Maintenance     5

Coverage I - Liability Under Contractual Agreements     6

Coverage J - Voluntary Settlements     6

Liability Coverage Exclusions     9

Liability Coverage Conditions     11

    Defense, Settlement and Supplementary Payments     11

    United States Army, Air Force and Navy Insurance Requirements     12

    Limits of Liability     13

    Financial Responsibility Laws     13



GLOBAL AEROSPACE

# PART II - MEDICAL EXPENSE COVERAGE

Coverage K - Medical Expense    14

Medical Expense Coverage Exclusion    14

Medical Expense Coverage Condition    15

# PART III - PHYSICAL DAMAGE COVERAGES

Coverage L - Physical Damage to Scheduled Aircraft - All Risks of Loss    16

Coverage M - Physical Damage to Spare Engines/Parts and Mechanics Tools - All Risks of Loss    16

Exclusions (Applicable to Coverages L and M)    17

Conditions (Applicable to Coverages L and M)    18

     Additional Duties of Named Insured    18

     Appraisal    18

     Salvage    18

     Automatic Reinstatement    18

     No Benefit to Others    18

Coverage N - Rental Cost of Temporary Replacement Parts    19

# POLICY EXCLUSIONS - GENERAL

   20

# POLICY DEFINITIONS - GENERAL

   21

# POLICY CONDITIONS - GENERAL

   24

Territorial Limits    24

Automatic Insurance for Newly Acquired Aircraft or Equipment    24

Two or More Aircraft    24

Other Insurance    25

Insureds Duties in Event of Occurrence or Loss    25

Action Against the Company    25

Changes    25

Assignment    26

Cancellation    26

Terms of Policy Conformed to Statute    26

Subrogation    26

Failure to Give Notice    26

Acts or Neglect of the First Named Insured    26

Declarations    27

# ENDORSEMENTS






Policy Number   MAP 41224J

The insurance afforded by this policy is provided by separate insurers, hereinafter referred to as "the Company." The liability of these insurers is several and not joint and is specifically set out below.

### THE COMPANIES

| | | |
|---|---|---|
| American Alternative Insurance Corporation | Wilmington, Delaware | 47.625% |
| National Indemnity Company of the South | Jacksonville, Florida | 43.375% |
| Tokio Marine & Nichido Fire Insurance Company, Ltd. (USB) | New York, New York | 9.000% |

# DECLARATIONS

**Item 1.** (a)   NAMED INSURED:   PLATINUM JET MANAGEMENT

(b)   ADDRESS OF NAMED INSURED:   1715 NW 51ST PLACE, HANGAR 70
FT. LAUDERDALE, FL  33309

**Item 2.** POLICY PERIOD:

From:  JANUARY 21, 2005
To:     JANUARY 21, 2006
12:01 A.M. Local time at the address set forth in Item 1. (b).

DECLARATIONS (Continued)

Item 3. LIMITS OF THE COMPANY'S LIABILITY:

The limits of the Company's liability with respect to the insurance afforded hereunder shall be as follows:

# PART I - LIABILITY COVERAGES

**Coverage A - Liability for Scheduled Aircraft**

SINGLE LIMIT BODILY INJURY AND
PROPERTY DAMAGE LIABILITY

* each *occurrence*

* *(See Endorsement No. 1)*

**Coverage B - Liability for Temporary Substitute Aircraft**

SINGLE LIMIT BODILY INJURY AND
PROPERTY DAMAGE LIABILITY

* each *occurrence*

* *(See Endorsement No. 1)*

**Coverage C - Liability for Non-Owned Aircraft**

SINGLE LIMIT BODILY INJURY AND
PROPERTY DAMAGE LIABILITY

$50,000,000. each *occurrence*

**Coverage D - Liability for Damage to Aircraft that are Not Owned**

PROPERTY DAMAGE LIABILITY

$8,500,000. each *occurrence*
(as part of and not in addition to the Limit
of Liability set forth in Coverage B or C
as applicable)


GLOBAL AEROSPACE

MAP (Rev. 01/01/2003)

# DECLARATIONS (Continued)

**Coverage E - Liability for Damage to Aircraft Hangars**

PROPERTY DAMAGE LIABILITY

$1,000,000. each *occurrence*
(as part of and not in addition to the Limit
of Liability set forth in Coverage A, B or
C as applicable)

**Coverage F - Liability for Damage to Personal Effects**

PROPERTY DAMAGE LIABILITY

$10,000. each *passenger* or *crew* member
(as part of and not in addition to the Limit
of Liability set forth in Coverage A, B or
C as applicable)

**Coverage G - Liability Arising out of the Use of Airport Premises**

SINGLE LIMIT BODILY INJURY AND
PROPERTY DAMAGE LIABILITY

$50,000,000. each *occurrence*

**Coverage H - Liability for Sale of Aircraft, Aircraft Parts or Maintenance**

SINGLE LIMIT BODILY INJURY AND
PROPERTY DAMAGE LIABILITY

$50,000,000. each *occurrence*

**Coverage I - Liability Under Contractual Agreements (Applicable to Aircraft and Airport Premises for which insurance is provided under Coverages A, B, C and G)**

SINGLE LIMIT BODILY INJURY AND
PROPERTY DAMAGE LIABILITY

$50,000,000. each *occurrence*
(as part of and not in addition to the Limit
of Liability set forth in Coverages A, B, C
and G)


GLOBAL AEROSPACE
MAP (Rev. 01/01/2003)

iii

DECLARATIONS (Continued)

**Coverage J** - Voluntary Settlements

| | |
|---|---|
| Each *passenger*: | $250,000. |
| Each *crew* member: | $250,000. |
| Each *occurrence*: | SEE PAGE 7 |

# PART II - MEDICAL EXPENSE COVERAGE

**Coverage K** - Medical Expense

As respects *aircraft*:                                    $ 10,000. each *passenger* or *crew* member

As respects the *Named Insured's airport premises*:    $ 10,000. each person
                                                       $200,000. each *occurrence*

# PART III - PHYSICAL DAMAGE COVERAGES

**Coverage L** - Physical Damage to Scheduled Aircraft - All Risks of Loss

The *Insured Value* of the aircraft described in Item 4. of the Declarations subject to the following deductibles:

| | |
|---|---|
| While the *aircraft* is *in motion* | NIL |
| While the *aircraft* is not *in motion* | NIL |

**Coverage M** - Physical Damage to Spare Engines/Parts/Mechanics Tools - All Risks of Loss

As respects *spare engines/parts*:

The Actual Cash Value of each *spare engine/part* subject to a maximum of $2,000,000. each loss.

As respects *mechanics tools*:

The Actual Cash Value of *mechanics tools* subject to a maximum of $2,500. each loss and deductible of $500. each loss.

## DECLARATIONS (Continued)

Coverage N - Rental Cost of Temporary Replacement Parts

$50,000. each loss

Item 4. DESCRIPTION OF INSURED AIRCRAFT:

| Year, Make and Model | Aircraft Identification Number | Seating Crew | Capacity Passenger | Insured Value |
|---|---|---|---|---|
| 1981 Canadair Challenger 600 | N370V | 3 | 10 | $7,000,000. |
| 1981 Canadair Challenger 601-3A | N260V | 3 | 12 | $7,000,000. |

Also includes those aircraft described in any Managed Aircraft Schedule attached to this policy.

# DECLARATIONS (Continued)

**Item 5.  AIRCRAFT USE:**

All operations of the *Named Insured*.

**Item 6.  PILOTS:**

The policy shall not apply while the *aircraft* is in *flight* unless the *pilot in command* has been approved by the *first Named Insured's* Chief Pilot or their designated representative.  The pilot requirements do not apply while the *aircraft* is in the care, custody or control of a repair or maintenance facility.

**Item 7.  PREMIUM:**

The premium and rates for all *aircraft* insured under this policy at inception are as have been agreed upon.  With respect to additional *aircraft* the premium and rates applying shall be as agreed upon between the *first Named Insured* and the Company.

Various provisions in this policy may restrict or limit coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Words and phrases that appear in *bold italicized* type have special meaning. Refer to their definitions in the policy.

In consideration of the payment of the premium, in reliance upon the statements in the Declarations made a part hereof, subject to all of the terms of this policy including the applicable Limits of Liability, the Company agrees

a. as respects those coverages indicated in Item 3. of the Declarations with the *first Named Insured* and any other person or organization qualifying under parts (a) and (b) of the policy definition of *Named Insured*, and

b. as respects those coverages indicated in Item 3. of each Managed Aircraft Schedule attached to this policy, with the person or organization named in that schedule,

as follows:

# PART I - LIABILITY COVERAGES

## INSURING AGREEMENTS

### COVERAGE A - LIABILITY FOR SCHEDULED AIRCRAFT

The Company shall pay on behalf of the *Insured* all sums which the *Insured* shall become legally obligated to pay as damages because of *bodily injury* sustained by any person and *property damage* caused by an *occurrence* and arising out of the ownership, maintenance or use of the *aircraft*. Use includes the serving of food and both alcoholic and non-alcoholic beverages on board the *aircraft* on a not for profit basis.

### COVERAGE B - LIABILITY FOR TEMPORARY SUBSTITUTE AIRCRAFT

While an *aircraft* described in Item 4. of the Declarations is withdrawn from normal use because of *its* breakdown, repair, servicing, loss or destruction, such insurance as is afforded under Coverages A, J and K is extended to apply with respect to the use by or on behalf of the *Named Insured* of a *temporary substitute aircraft*. Coverage B is subject to the following provision which is in addition to all other applicable provisions not herein revised:

#### CONDITION (Applicable to Coverage B)

The general policy condition "OTHER INSURANCE" is revised to read as follows:

Except with respect to insurance specifically purchased by the *Named Insured* to apply in excess of this insurance, the insurance afforded by Coverage B shall be excess insurance over any other valid and collectible insurance available to the *Insured*, either as an insured under a policy applicable to the *temporary substitute aircraft* or otherwise. When the insurance afforded by this policy is excess over any other insurance, then the Company's limits of liability in this policy shall be reduced by the applicable limits of such other insurance if such other insurance shall have been written through Global Aerospace Underwriting Managers Limited or any of its subsidiaries or subsidiaries thereof.



PART I (Continued)

COVERAGE C - LIABILITY FOR NON-OWNED AIRCRAFT

Such insurance as is afforded by Coverages A and K shall apply to the use of *non-owned aircraft* by or on behalf of the *Named Insured*. Coverage C is subject to the following provisions which are in addition to all other applicable provisions not herein revised:

EXCLUSION (Applicable to Coverage C)

This insurance does not apply to *bodily injury* or *property damage* arising out of any goods or products manufactured, sold, handled or distributed by a *Named Insured* or by others trading under its name.

DEFINITIONS (Applicable to Coverage C)

1.      The policy definition of *"Insured"* is revised to read as follows:

The unqualified word *"Insured"* means (a) any *Named Insured* and (b) any director, executive officer or employee of a *Named Insured* corporation or a partner of a *Named Insured* partnership while such person is acting in the capacity as such provided that no person shall be an *Insured* with respect to any *aircraft* owned in whole or in part by, registered in the name of, or leased for a period in excess of thirty (30) days by such person or any member of that person's household.

2.      The policy definition of *"Named Insured"* is revised to read as follows:

*"Named Insured"* means:

(a)     the person(s) or organization(s) named in Item 1.(a) of the Declarations.

(b)     any organization newly formed or acquired by the person(s) or organization(s) named in Item 1.(a) of the Declarations, other than a partnership, joint venture or limited liability company, and over which the person(s) or organization(s) named in Item 1.(a) of the Declarations maintains ownership or majority interest, provided there is no other similar insurance available to that organization. However:

(i)     coverage under this provision is afforded only until the 60th day after the organization is formed or acquired or until the end of the policy period, whichever is earlier; and

(ii)    Coverage C does not apply to *bodily injury* or *property damage* that occurred before the organization was formed or acquired.

CONDITIONS (Applicable to Coverage C)

1.      Pilots. The provisions of Item 6. PILOTS - of the Declarations shall not apply to Coverage C.

## PART I (Continued)

2. The general policy condition "**OTHER INSURANCE**" is revised to read as follows:

Except with respect to insurance specifically purchased by the *Named Insured* to apply in excess of this insurance, the insurance afforded by Coverage C shall be excess insurance over any other valid and collectible insurance available to the *Insured*, either as an *Insured* under a policy applicable to the *non-owned aircraft* or otherwise. When the insurance afforded by this policy is excess over any other insurance, then the Company's limits of liability in this policy shall be reduced by the applicable limits of such other insurance if such other insurance shall have been written through Global Aerospace Underwriting Managers Limited or any of its subsidiaries or subsidiaries thereof.

## COVERAGE D - LIABILITY FOR DAMAGE TO AIRCRAFT THAT ARE NOT OWNED

Notwithstanding the provisions of Exclusion (d) of Part I - LIABILITY COVERAGES, the insurance afforded under Coverage A is extended to apply to *property damage* to any of the following aircraft while in the care, custody or control of the *Named Insured*:

(a)     aircraft for which insurance is afforded under Coverage B or C; or

(b)     any other aircraft.

Coverage D is subject to the following provisions which are in addition to all other applicable provisions not herein revised:

### LIMIT OF LIABILITY (Applicable to Coverage D)

The Company's Limit of Liability under Coverage D shall not exceed $8,500,000. per *occurrence* which shall be a part of and not in addition to the Company's Limit of Liability under Coverage B or C as applicable.

### EXCLUSIONS (Applicable to Coverage D)

This insurance does not apply:

(a)     as respects subparagraph (b) above:

   (1)     to *property damage* to *aircraft* described under Item 4. of the Declarations,

   (2)     to the liability of any *Named Insured* for *property damage* to any aircraft leased to or owned in whole or in part by or registered in the name of that *Named Insured*, or

   (3)     to the liability of the *first Named Insured* for *property damage* to any aircraft it manages which is not described in a Managed Aircraft Schedule attached to this policy or does not qualify under paragraph 2. of POLICY CONDITIONS - GENERAL.

(b)     while the *aircraft* is in *flight* unless the *pilot in command* is employed as a pilot by a *Named Insured*, or has been approved by the *first Named Insured's* Chief Pilot or that Chief Pilot's designated representative.

(c)     to *property damage* arising out of any goods or products manufactured, sold, handled or distributed by a *Named Insured* or by others trading under its name.

## PART I (Continued)

### COVERAGE E - LIABILITY FOR DAMAGE TO AIRCRAFT HANGARS

Notwithstanding the provisions of Exclusion (d) of Part I - LIABILITY COVERAGES - the insurance afforded under Coverages A, B and C is extended to apply to damage to or destruction of any aircraft hangars (or portions thereof), or the contents thereof (excluding aircraft) which are in the care, custody or control of the *Insured*. Coverage E is subject to the following provision which is in addition to all other applicable provisions not herein revised:

#### LIMIT OF LIABILITY (Applicable to Coverage E)

The Company's Limit of Liability under Coverage E shall not exceed $1,000,000. per *occurrence* which shall be a part of and not in addition to the Company's Limit of Liability under Coverage A, B or C as applicable.

### COVERAGE F - LIABILITY FOR DAMAGE TO PERSONAL EFFECTS

Notwithstanding the provisions of Exclusion (d) of Part I - LIABILITY COVERAGES - the insurance afforded under Coverages A, B and C is extended to apply to the personal effects of *passengers* and *crew* members which are in the care, custody or control of the *Insured*. Coverage F is subject to the following provision which is in addition to all other applicable provisions not herein revised:

#### LIMIT OF LIABILITY (Applicable to Coverage F)

The Company's Limit of Liability under Coverage F shall not exceed $10,000. per *passenger* or *crew* member and shall be a part of and not in addition to the Company's Limit of Liability under Coverage A, B or C as applicable.

### COVERAGE G - LIABILITY ARISING OUT OF THE USE OF AIRPORT PREMISES

The Company shall pay on behalf of the *Insured* all sums which the *Insured* shall become legally obligated to pay as damages because of *bodily injury* sustained by any person and *property damage* caused by an *occurrence* and arising out of the ownership, maintenance or use of *airport premises*. Use includes:

(a)     the operation of *mobile equipment* on *airport premises*; and

(b)     the serving of food and both alcoholic and non-alcoholic beverages on *airport premises* on a not for profit basis.

Coverage G is subject to the following provisions which are in addition to all other applicable provisions not herein revised:

#### CONDITION (Applicable to Coverage G)

The general policy condition "OTHER INSURANCE" is revised to read as follows:

The insurance afforded by Coverage G shall be excess insurance over any other valid and collectible insurance available to the *Insured*.

## PART I (Continued)

### DEFINITION (Applicable to Coverage G)

With respect to the operation of *mobile equipment*, the policy definition of *"Insured"* is revised to read as follows:

The unqualified word *"Insured"* means, (1) the *Named Insured* and (2) (a) any person while using the *mobile equipment* with the permission of the *Named Insured* provided the actual use is within the scope of such permission and (b) any other person or organization, but only with respect to that person's or organization's liability because of acts or omissions of the *Named Insured* or of an *Insured* under (a) above.

### COVERAGE H – LIABILITY FOR SALE OF AIRCRAFT, AIRCRAFT PARTS OR MAINTENANCE

The Company shall pay on behalf of the *Insured* all sums which the *Insured* shall become legally obligated to pay as damages because of *bodily injury* or *property damage* caused by an *occurrence* and arising out of:

(a)         aircraft that the *first Named Insured* has relinquished from its exclusive management control,

(b)         aircraft that the *Named Insured* has either sold or relinquished from an exclusive written lease, or

(c)         materials, parts, equipment, fuel, lubricants or maintenance services for aircraft of others provided or performed by the *Named Insured* on a not for profit basis,

but only if the *bodily injury* or *property damage* occurs away from *airport premises* owned by or rented to the *Named Insured* and after physical possession of such aircraft, materials, parts, equipment, lubricants or fuel has been relinquished to others.  Coverage H is subject to the following provision which is in addition to all other applicable provisions not herein revised:

### EXCLUSION (Applicable to Coverage H)

This insurance does not apply to *bodily injury* or *property damage* arising out of the sale or relinquishment from an exclusive written lease of aircraft, if the *Insured* is in the business of:

(1)         manufacturing aircraft;

(2)         selling aircraft; or

(3)         distributing aircraft.

Subparagraphs (2) and (3) of this Exclusion do not apply to the *first Named Insured.*

### CONDITION (Applicable to Coverage H)

The general policy condition "OTHER INSURANCE" is revised to read as follows:

The insurance afforded by Coverage H shall be excess insurance over any other valid and collectible insurance available to the *Insured.*

## PART I (Continued)

**COVERAGE I -** LIABILITY UNDER CONTRACTUAL AGREEMENTS (APPLICABLE ONLY TO AIRCRAFT AND AIRPORT PREMISES FOR WHICH INSURANCE IS PROVIDED UNDER COVERAGES A, B, C AND G)

Exclusion (a) of Part I - LIABILITY COVERAGES - does not apply to the assumption by any *Named Insured* of the liability of others for *bodily injury* or *property damage* in any written contract or agreement, provided that *Named Insured* submits a copy of all such agreements to the Company within a reasonable time after coming to the attention of that *Named Insured* or its Insurance Department, if any. The Company reserves the right to charge an additional premium for any such agreement so submitted. The Company hereby waives the submission requirement with respect to temporary aircraft storage and minor servicing agreements, *military or governmental agreements*, lease of *airport premises* agreements and agreements approved by the Company prior to the effective date of this policy. Coverage I is subject to the following provisions which are in addition to all other applicable provisions not herein revised:

### EXCLUSIONS (Applicable to Coverage I)

This insurance does not apply to liability assumed by a *Named Insured*:

(a)     under any oral contract or agreement, nor

(b)     under any written contract

    (1)          with or for the benefit of *passengers, crew* members or their heirs, nor

    (2)          insofar as it pertains to major alterations or major repairs as defined in the *Federal Aviation Administration* regulations, nor

    (3)          with respect to the purchase or sale of aircraft.

## COVERAGE J - VOLUNTARY SETTLEMENTS

1.  Irrespective of legal liability, the Company shall offer to pay on behalf of the *Insured*, at the request of the *first Named Insured* for the account of all *Named Insureds*, benefits as set forth below, to or for the benefit of each *passenger* or *crew* member who sustains *bodily injury* caused by an *occurrence* arising out of the ownership, maintenance or use of the *aircraft* (as defined in Coverage J below).

2.  If such *bodily injury*, directly and independently of all other causes, shall result:

    (a)     within one year of the *occurrence*, in (i) the death of the *passenger* or *crew* member, or the *loss* of a hand, foot or eye in addition to the *loss* of any other hand, foot or eye, then the Company shall offer to pay the sum requested by the *first Named Insured* but not exceeding the applicable "Each Passenger" or "Each Crew Member" settlement limit set forth in the Schedule of Aircraft and Settlement Limits below; or (ii) the *loss* of a single hand, foot or eye, then the Company shall offer to pay the sum requested by the *first Named Insured* but not exceeding one half (1/2) of the applicable "Each Passenger" or "Each Crew Member" settlement limit set forth in the Schedule of Aircraft and Settlement Limits below;

## PART I (Continued)

(b)  in the injured *passenger* or *crew* member becoming *permanently totally disabled*, the Company shall offer to pay the sum requested by the *first Named Insured* but not exceeding the applicable "Each Passenger" or "Each Crew Member" settlement limit set forth in the Schedule of Aircraft and Settlement Limits below;

(c)  in the injured *passenger* or *crew* member becoming *totally disabled*, the Company shall, within thirty (30) days of payment, reimburse any *Named Insured* for payments made to the injured *passenger* or *crew* member for loss of earnings as a result of such disability, but not exceeding (i) eighty percent (80%) of the average weekly wage of the injured *passenger* or *crew* member based upon the twelve (12) month period immediately preceding the date of *occurrence*, or (ii) one half (1/2) of one percent (1%) of the applicable "Each Passenger" or "Each Crew Member" settlement limit set forth in the Schedule of Aircraft and Settlement Limits below or (iii) $1,250. per week, whichever is the least, for the period of such continuous *total disability* up to a maximum of one hundred four (104) consecutive weeks.

3.  The amount otherwise due and payable under any one of the foregoing benefits shall be reduced by the amount of any payments previously made under the provisions of Coverage J to or for the same *passenger* or *crew* member as a result of any one *occurrence*.

4.  Schedule of Aircraft and Settlement Limits:

| Aircraft Identification Number | SETTLEMENT LIMITS | | |
|---|---|---|---|
| | Each Passenger | Each Crew Member | Each Occurrence |
| N370V | $250,000. | $250,000. | $3,250,000. |
| N260V | $250,000. | $250,000. | $3,750,000. |

Also includes those aircraft described in any Managed Aircraft Schedule attached to this policy which are specifically identified as being insured under Coverage J.

5.  Coverage J is subject to the following provisions which are in addition to all other applicable provisions not herein revised:

### LIMITS OF LIABILITY (Applicable to Coverage J)

The settlement limits set forth in the above Schedule of Aircraft and Settlement Limits are included in and are a part of the Limits of Liability as set forth in Item 3. of the Declarations for Coverage A and are not in addition thereto.

Regardless of the seating capacity of any *temporary substitute aircraft* or any aircraft qualifying under paragraph 2. of POLICY CONDITIONS - GENERAL, the "Each Passenger", "Each Crew Member" and "Each Occurrence" settlement limits applicable thereto shall be the same as the highest of any such limits set forth in the above Schedule of Aircraft and Settlement Limits.

The Company's Limit of Liability as set forth in Coverage A for each *occurrence* shall be reduced by the amount of payments made under the provisions of this Coverage J to or for all *passengers* or *crew* members as the result of each *occurrence*.

## PART I (Continued)

The total amount which the Company shall offer to pay to or for the benefit of any one injured *passenger* or *crew* member shall not exceed the amount set forth in the above Schedule of Aircraft and Settlement Limits as the settlement limit respectively applicable to "Each Passenger" or "Each Crew Member". The total amount which the Company shall offer to pay to or for the benefit of two (2) or more injured *passengers* or *crew* members in any one *occurrence* shall not exceed the amount set forth in the above Schedule of Aircraft and Settlement Limits as the settlement limit applicable to "Each Occurrence". Payment of any amount to or for any injured *passenger* or *crew* member under the provisions of Coverage A shall operate to terminate the Company's obligations hereunder with respect to such *passenger* or *crew* member.

### DEFINITIONS (Applicable to Coverage J)

*"Loss"* means, with respect to a hand or foot, severance at or above the wrist or ankle; with respect to an eye, the entire and irrecoverable loss of sight.

*"Permanently Totally Disabled"* means the inability of the injured *passenger* or *crew* member after twelve (12) months of being continuously *totally disabled*, to perform each and every duty pertaining to any occupation or employment for wage or profit for the rest of that person's life.

*"Totally Disabled"* means the complete inability to perform each and every duty pertaining to one's occupation.

The policy definition of *"Aircraft"* is revised to read as follows:

*"Aircraft"* means only the aircraft described in the above Schedule of Aircraft and Settlement Limits, any aircraft substituted therefor to which Coverage B applies or any aircraft qualifying under paragraph 2. of POLICY CONDITIONS - GENERAL.

### CONDITIONS (Applicable to Coverage J)

1. **Liability Release Required.**

   Except with respect to benefits payable under paragraph 2. (c) above, no payment shall be made until the injured *passenger* or *crew* member and all persons claiming by, through or under said *passenger* or *crew* member shall have executed, in a form acceptable to the Company, a full and final release of all claims for damages for which insurance is provided under Coverage A.

2. **Refusal to Accept Offer.**

   If the injured *passenger* or *crew* member and all persons having a claim by, through or under such *passenger* or *crew* member refuse to accept the sum offered, or fail to execute the required release within ninety (90) days of the date of the offer, or if claim is made or if suit is brought against an *Insured* for such *bodily injury*, then this Coverage J shall become null and void as respects such *passenger* or *crew* member and the provisions of Coverage A shall apply.

# PART I (Continued)

3. **Physical Examinations and Reports.**

The injured *passenger* or *crew* member or someone on that person's behalf shall, at the request of the Company, furnish reasonably obtainable information pertaining to the injuries and execute authorization to enable the Company to obtain medical reports and copies of records. The injured *passenger* or *crew* member shall submit to physical examination by physicians selected by the Company when and as often as the Company may reasonably require.

4. **No Admission.**

Any offer, payment or acceptance of benefits under the provisions of Coverage J shall not constitute an admission of liability or any other type of admission whatsoever on the part of the Company or of the *Insured*.

5. **Provisions Applicable.**

All policy provisions applicable to Coverage A shall apply to the insurance afforded under this Coverage J except the Limit of the Company's Liability section and Exclusion (c) of Part I.

6. The general policy condition "OTHER INSURANCE" is revised to read as follows:

If any other Voluntary Settlement insurance (or Passenger, Crew Member or Guest Voluntary Settlement insurance) is available to or for the benefit of the injured *passenger* or *crew* member and shall have been written through Global Aerospace Underwriting Managers Limited or any of its subsidiaries or subsidiaries thereof, the settlement limits specified in the above Schedule of Aircraft and Settlement Limits shall be reduced by the amount of such other insurance.

## LIABILITY COVERAGE EXCLUSIONS
### (APPLICABLE TO ALL PART I COVERAGES)

This insurance does not apply:

(a) to liability assumed by the *Insured* except as provided by Coverage I.

(b) to any obligation for which the *Insured* or any carrier as the *Insured's* insurer may be held liable under any worker's compensation, unemployment compensation or disability benefits law, or under any similar law.

(c) to *bodily injury* to any employee of the *Insured* arising out of and in the course of that person's employment by such *Insured*; but this Exclusion (c) does not apply to liability assumed by a *Named Insured* under any *military or governmental agreement*, or to the insurance afforded under Coverage J.

(d) to *property damage* to property owned, occupied, rented or used by the *Insured* or in the care, custody or control of the *Insured* or as to which the *Insured* is for any purpose exercising physical control except as afforded under Coverages D, E and F.

## PART I (Continued)

(e) to *bodily injury* or *property damage* arising out of:

    (1)    noise, whether or not it is audible to the human ear, or vibration, including sonic boom or similar phenomena caused by the movement or operation of an aircraft or any of its parts; or

    (2)    any interference with the quiet enjoyment of property of others caused by the operation of an aircraft or any of its parts.

(f) to *bodily injury* or *property damage* arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of *pollutants*:

    (1)    that are in or upon an aircraft;

    (2)    that are contained in any property that is in or upon an aircraft.

Exclusions (e) and (f) above do not apply to *bodily injury* or *property damage* caused by or resulting from an aircraft crash, fire, explosion, collision or a recorded in-flight emergency causing abnormal aircraft operation.

(g) to *bodily injury* or *property damage* arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of *pollutants*:

    (1)    at or from any premises, site or location that is or was at any time owned or occupied by, or rented or loaned to, any *Insured*;

    (2)    at or from any premises, site or location that is or was at any time used by or for any *Insured* or others for the handling, storage, disposal, processing or treatment of waste;

    (3)    which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any *Insured* or any person or organization for whom any *Insured* may be legally responsible; or

    (4)    at or from any premises, site or location on which any *Insured* or any contractors or subcontractors working directly or indirectly on any *Insured's* behalf are performing operations:

        (a)    if the *pollutants* are brought on or to the premises, site or location in connection with such operations by such *Insured*, contractor or subcontractor; or

        (b)    if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of *pollutants*.

Subparagraphs (g)(1) and (g)(4)(a) do not apply to *bodily injury* or *property damage* arising out of heat, smoke or fumes from a hostile fire. In this Exclusion (g), a hostile fire means one that becomes uncontrollable or breaks out from where it is intended to be.

(h) to any loss, cost, or expense arising out of any:

    (1)    request, demand or order that any *Insured* or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of *pollutants*; or



## PART I (Continued)

(2)    claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to or assessing the effects of *pollutants*,

unless resulting from an *aircraft* crash, fire, explosion or collision or a recorded in-flight emergency causing abnormal *aircraft* operation.

In Exclusion (h) above, "*aircraft*" means the aircraft described in Item 4. of the Declarations and any aircraft for which insurance is afforded under Coverage B or C, or under paragraph 2. of POLICY CONDITIONS - GENERAL.

## LIABILITY COVERAGE CONDITIONS
### (APPLICABLE TO ALL PART I COVERAGES)

## 1. DEFENSE, SETTLEMENT AND SUPPLEMENTARY PAYMENTS

(a)    The Company shall have the right and duty to defend any suit against the *Insured* seeking damages on account of such *bodily injury* or *property damage*, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.

During such time as the Company is obligated to defend a claim or claims under the provisions of the preceding paragraph, the Company shall pay with respect to such claim, in addition to the applicable Limit of Liability:

(1)    all expenses incurred by the Company, all costs taxed against the *Insured* in any suit defended by the Company and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the Company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the Company's liability thereon;

(2)    premiums on appeal bonds required in any such suit, premiums on bonds to release attachments in any such suit for an amount not in excess of the applicable Limit of Liability of this policy, and the cost of bail bonds required of the *Insured* because of an *occurrence* or violation of law or a regulation for civil aviation arising out of the use of *aircraft*, not to exceed $2,500. per bail bond, but the Company shall have no obligation to apply for or furnish any such bonds;

(3)    expenses incurred by the *Insured* for first aid to others at the time of an accident, for *bodily injury* to which this policy applies;

(4)    all reasonable expenses incurred by the *Insured* at the Company's request, including loss of earnings, wages or salaries of employees of the *Insured* not to exceed $100. per day, per employee.


GLOBAL AEROSPACE
MAP (Rev. 01/01/2003)

## PART I (Continued)

(b) The Company shall pay, in addition to the applicable Limits of Liability:

(1) expenses incurred by the *Insured* under emergency conditions for charges made by other than an *Insured* but limited to those expenses associated with labor, materials, rental of equipment, vehicles or tools for:

(i) application of foam on a runway preceding any emergency or crash landing;

(ii) fire and crash control and rescue; or

(iii) any precautionary off-airport landing.

In no event shall the Company's Limit of Liability for expenses and charges covered exceed $250,000. for any one *occurrence* with respect to any one *aircraft*.

(2) the expenses of search and rescue operations connected with any missing and presumed crashed *aircraft* described in Item 4. of the Declarations; but only after authorities have abandoned search operations, and provided there are reasonable grounds to suspect that such search could produce results.

It is further agreed that such expenditures must be agreed to in advance by the Company, and the Company's Limit of Liability is $250,000. each *occurrence*.

The coverage under paragraphs (b)(1) and (b)(2) above does not include:

(1) any medical, hospital or funeral expense;

(2) loss or damage to equipment used in search and/or rescue operations;

(3) injury or death of any person(s) involved in such operations;

(4) expense incurred after it has been reasonably established that there are no survivors;

(5) or any expense for salvage of all or part of the *aircraft*.

## 2. UNITED STATES ARMY, AIR FORCE AND NAVY INSURANCE REQUIREMENTS

If Global Aerospace, Inc. issues a Department of Defense certificate of insurance DD Form 2400 or any substitute or replacement thereof, then the insurance policy provisions required by the regulation referred to therein shall be deemed to be incorporated herein and substituted for any policy provisions inconsistent therewith.

## PART I (Continued)

3. LIMITS OF LIABILITY

    (a)    **Total Liability**

    Irrespective of the number of (1) *Insureds* under this policy, (2) persons or organizations who sustain *bodily injury* or *property damage*, (3) claims made or suits brought on account of *bodily injury* or *property damage*, or (4) *aircraft* to which this policy applies, the Company's liability is limited as follows:

    The total liability of the Company for all damages, including damages for care and loss of services, because of *bodily injury* or *property damage* sustained by one or more persons or organizations as the result of any one *occurrence* shall not exceed the Limit of Liability stated in the Declarations as applicable to "each *occurrence*".

    For the purpose of determining the limit of the Company's liability, all *bodily injury* and *property damage* arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one *occurrence*.

    (b)    **Severability of Interests**

    The insurance afforded applies separately to each *Insured* against whom claim is made or suit is brought, except with respect to the limits of the Company's liability.

4. FINANCIAL RESPONSIBILITY LAWS

    When this policy is certified as proof of financial responsibility for the future under the provisions of any aircraft financial responsibility law, such insurance as is afforded by this policy for *bodily injury* liability and *property damage* liability shall comply with the provisions of such law to the extent of the Coverage and Limits of Liability required by such law, but in no event in excess of liability stated in this policy. The *Insured* agrees to reimburse the Company for any payment made by the Company which it would not have been obligated to make under the terms of this policy except for the agreement contained in this paragraph.



# PART II - MEDICAL EXPENSE COVERAGE

## INSURING AGREEMENT

### COVERAGE K - MEDICAL EXPENSE

As respects *aircraft*:

The Company shall pay all reasonable *medical expenses* incurred within one year from the date of injury, to or for each *passenger* or *crew* member who sustains *bodily injury* caused by an *occurrence*, provided the *aircraft* is being used by or with the permission of the *Named Insured*.

As respects the *Named Insured's airport premises*:

The Company shall pay all reasonable *medical expenses* incurred within one year from the date of injury, to or for each person who sustains *bodily injury* caused by an *occurrence* while on the *Named Insured's airport premises*.

Coverage K is subject to the following provisions which are in addition to all other applicable provisions not herein revised:

### LIMIT OF LIABILITY (Applicable to Coverage K)

As respects *aircraft*:

The total liability of the Company for all *medical expenses* incurred by or on behalf of each *passenger* or *crew* member who sustains *bodily injury* as the result of any one *occurrence* shall not exceed the Limit of Liability stated in the Declarations as applicable to "each *passenger* or *crew* member".

As respects the *Named Insured's airport premises*:

The total liability of the Company for all *medical expenses* incurred by or on behalf of each person as the result of any one *occurrence* shall not exceed the Limit of Liability stated in the Declarations as applicable to "each person". The total liability of the Company for all *medical expenses* incurred by or on behalf of two or more persons as the result of any one *occurrence* shall not exceed the Limit of Liability stated in the Declarations as applicable to "each *occurrence*."

### EXCLUSION (Applicable to Coverage K)

This insurance does not apply to *medical expense* incurred by or for any employee of the *Insured* to the extent that such expense is payable under any worker's compensation or disability benefits law, or under any similar law.

## PART II (Continued)

### CONDITION (Applicable to Coverage K)

**Medical Reports: Proof and Payment of Claim.**

As soon as practicable the injured person or someone on the injured person's behalf shall give to the Company written proof of claim, under oath if required, and shall, after each request from the Company, execute authorization to enable the Company to obtain medical reports and copies of records. The injured person shall submit to physical examination by physicians selected by the Company when and as often as they may reasonably require. The Company may pay the injured person or any person or organization rendering the services and such payment shall reduce the amount payable hereunder for such injury. Payment hereunder shall not constitute an admission of liability of any person or organization or of the Company.

# PART III - PHYSICAL DAMAGE COVERAGE

## INSURING AGREEMENTS

### COVERAGE L - PHYSICAL DAMAGE TO SCHEDULED AIRCRAFT - ALL RISKS OF LOSS

The Company shall pay for any *physical damage* loss to the *aircraft* described in Item 4. of the Declarations including *disappearance* of the *aircraft*. Loss, if any, shall be adjusted with and payable to the *first Named Insured* for the account of all interests unless otherwise provided by policy endorsement. Coverage L is subject to the following provisions which are in addition to all other applicable provisions not herein revised:

#### LIMITS OF LIABILITY, EXCLUSIONS AND CONDITIONS (Applicable to Coverage L)

For Limits of Liability, Exclusions and Conditions applicable under this coverage, see Coverage M.

### COVERAGE M - PHYSICAL DAMAGE TO SPARE ENGINES/PARTS AND MECHANICS TOOLS - ALL RISKS OF LOSS

The Company shall pay for any *physical damage* loss to *spare engines* and *spare parts* which are owned by the *Named Insured* or for which the *Named Insured* is legally responsible but only to the extent of the *Named Insured's* financial interest in such *spare engines* or *spare parts*. The Company shall also pay for any *physical damage* to *mechanics tools* owned by the *Named Insured's* employee mechanics.

Coverages L and M are subject to the following provisions which are in addition to all other applicable provisions not herein revised:

#### LIMITS OF LIABILITY (Applicable to Coverages L and M)

In the event of a *total loss* the Company shall pay the *Insured Value* of the *aircraft* less any applicable deductible or with respect to the *spare engine(s)*, *spare part(s)* or *mechanics tools* the actual cash value less any applicable deductible whereupon the Company's liability with respect to such *aircraft*, *spare engine(s)*, *spare part(s)* or *mechanics tools* shall terminate. In addition, the Company shall refund the pro-rata unearned premium for such *aircraft*.

In the event of a *partial loss* the Company's liability shall not exceed the "cost to repair" the *aircraft*, *spare engine(s)*, *spare part(s)* or *mechanics tools*, less any applicable deductible, but in no event shall the Company's liability for a *partial loss* exceed the amount for which the Company would be liable if the *aircraft*, *spare engine(s)*, *spare part(s)* or *mechanics tools* were a *total loss*.

The "cost to repair" shall consist of (a) transportation charges as specified herein and (b) the actual cost to repair the damaged property with materials and parts of like kind and quality with charges for labor at straight time rates and including overhead if repairs are made by the *Named Insured*. Transportation charges shall consist of the cost, where necessary, of transporting new or damaged parts or of transporting the damaged *aircraft*, *spare engine(s)*, *spare part(s)* or *mechanics tools* to the place of repair and return to the place of accident or home airport, whichever is nearer, by the least expensive reasonable means.



## PART III (Continued)

The Company shall have the right to return stolen property anytime before the loss is paid with payment for any resultant *physical damage*.

Except with respect to the insurance afforded for *mechanics tools*, the amount specified as a deductible does not apply to losses caused by fire, lightning, explosion, transportation, theft, robbery or pilferage; however, loss caused by fire or explosion resulting directly or indirectly from collision of the *aircraft* while *in motion* shall be subject to the *in motion* deductible, if any.

In the event that two (2) or more *aircraft* are insured hereunder, the applicable deductible shall apply separately to each.

### DEFINITION (Applicable to Coverage M)

**"*Mechanics tools*"** means tools which are owned by mechanics employed by a *Named Insured* and designated for use on *aircraft* and stored primarily at the *Named Insured's airport premises*.

### EXCLUSIONS (Applicable to Coverages L and M)

This insurance does not apply to *physical damage*:

(a)     to tires caused by any peril other than fire, theft, vandalism or malicious mischief.

(b)     caused by and confined to:

(1) wear and tear,

(2) deterioration, or

(3) mechanical or electrical breakdown, failure or malfunction.

When used in Exclusion (b) in connection with an *aircraft* engine, *spare engine* or auxiliary power unit, the breakdown, failure or malfunction of any component, accessory or part thereof shall be considered breakdown, failure or malfunction of the entire engine or unit and any resulting *physical damage* to the engine or unit shall also be considered to be "mechanical or electrical breakdown, failure or malfunction".

(c)     to *aircraft* engines, *spare engines* and auxiliary power units caused by:

(1)     foreign object damage (damage caused by object(s) not a part of the engine or unit or the accessories of either) whether resulting from ingestion or otherwise; or

(2)     heat which results from the operation, attempted operation or shutdown of the engine or unit.

Paragraph (1) of Exclusion (c) does not apply if such *physical damage* is the result of a single incident sustained during the policy period which is of sufficient severity, when such *physical damage* is discovered, to require immediate repairs in compliance with the requirements of the *aircraft* engine, *spare engine* or auxiliary power unit manufacturer.

Exclusions (a), (b) and (c) do not apply if such *physical damage* is coincident with and the direct result of other *physical damage* covered by this policy.



## PART III (Continued)

### CONDITIONS (Applicable to Coverages L and M)

1.  **Additional Duties of the Named Insured.**

    In the event of loss, the *Named Insured* shall:

    (a)  protect the *aircraft, spare engine(s), spare part(s)* or *mechanics tools* whether or not the loss is covered by this policy and any further loss due to the *Named Insured's* failure to protect shall not be recoverable under this policy; reasonable expenses incurred in affording such protection shall be deemed to be incurred at the Company's request;

    (b)  file with the Company within ninety-one (91) days after loss, sworn proof of loss in such form and including such information as the Company may reasonably require and shall, upon the Company's request, submit to examination under oath, exhibit the damaged property and produce for the Company's examination all pertinent records and invoices, permitting copies thereof to be made, all at such reasonable times and places as the Company shall designate;

    (c)  do all things necessary to transfer title to any salvage, including the insured *aircraft, spare engine(s), spare part(s)* or *mechanics tools* if it is a *total loss*, to the Company or its nominee.

2.  **Appraisal.**

    If the *first Named Insured* and the Company fail to agree as to the amount of loss, either may, within sixty (60) days after proof of loss is filed, demand an appraisal of the loss. In such event, the *first Named Insured* and the Company shall each select a competent appraiser, and the appraisers shall select a competent and disinterested umpire. The appraisers shall appraise the amount of the loss and failing to agree shall submit their differences to the umpire. An award in writing of any two (2) shall determine the amount of loss. The *first Named Insured* and the Company shall each pay its chosen appraiser and shall bear equally the other expenses of the appraisal and the umpire. The Company shall not be held to have waived any of its rights by any act relating to appraisal.

3.  **Salvage.**

    The value of all salvaged property shall inure to the benefit of the Company, however, there shall be no abandonment without consent of the Company.

4.  **Automatic Reinstatement.**

    In the event of a *partial loss,* whether or not such loss is covered by this policy, the *Insured Value* of the *aircraft* as shown in Item 4. of the Declarations shall be reduced as of the time of loss by the amount of such loss. Upon the commencement of repairs, the *Insured Value* shall be increased by the value of the completed repairs until the *Insured Value* of the *aircraft* as shown in Item 4. of the Declarations is fully restored or this policy terminates, whichever shall first occur.

5.  **No Benefit to Others.**

    The insurance afforded by this policy shall not inure directly or indirectly to the benefit of any carrier or bailee liable for loss to the insured *aircraft, spare engine(s), spare part(s)* or *mechanics tools.*



## PART III (Continued)

COVERAGE N - RENTAL COST OF TEMPORARY REPLACEMENT PARTS

If an *aircraft* described in Item 4. of the Declarations is withdrawn from normal use due to *physical damage* loss covered by this policy, and if such loss is limited to damage to a repairable *component*, the Company agrees to reimburse the *first Named Insured* for the rental cost of a temporary replacement *component* including direct cost of installation, removal and transportation for the period necessary to repair the original *component*; provided, however, the Company's Limit of Liability for such rental cost (including direct cost of installation, removal and transportation) shall not exceed $50,000. each loss.  Coverage N is subject to the following provision which is in addition to all other applicable provisions not herein revised:

### DEFINITION (Applicable to Coverage N)

*"Component"* means any *aircraft* part excluding any such *aircraft* parts in the *Insured's* possession as *spare part(s)* or *spare engines* or any other *aircraft* parts under an existing lease or exchange agreement.

# POLICY EXCLUSIONS - GENERAL

War, Hi-jacking and Other Perils Exclusion.  This policy does not cover claims caused by

(a)    War, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, martial law, military or usurped power or attempts at usurpation of power.

(b)    Any hostile detonation of any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter.

(c)    Strikes, riots, civil commotions or labor disturbances.

(d)    Any act of one or more persons, whether or not agents of a sovereign power, for political or terrorist purposes and whether the loss or damage resulting therefrom is accidental or intentional.

(e)    Any malicious act or act of sabotage.

(f)    Confiscation, nationalization seizure, restraint, detention, appropriation, requisition for title or use by or under the order of any Government (whether civil military or de facto) or public or local authority.

(g)    Hi-jacking or any unlawful seizure or wrongful exercise of control of the *aircraft* or *crew* in *flight* (including any attempt at such seizure or control) made by any person or persons on board the *aircraft* acting without the consent of the *Named Insured*.

Furthermore, this policy does not cover claims arising while the *aircraft* is outside the control of the *Named Insured* by reason of any of the above perils.  The *aircraft* shall be deemed to have been restored to the control of the *Named Insured* on the safe return of the *aircraft* to the *Named Insured* at an airfield not excluded by the geographical limits of this policy, and entirely suitable for the operation of the *aircraft* (such safe return shall require that the *aircraft* be parked with engines shut down and under no duress).

# POLICY DEFINITIONS - GENERAL

(Applicable to all Coverages unless superseded by the provisions set forth under Insuring Agreements)

When appearing in this policy:

*"Aircraft"*, unless otherwise defined, means the aircraft described in Item 4. of the Declarations and any aircraft for which insurance is afforded under COVERAGE B or C, including the propulsion system and parts and equipment installed in or on the aircraft (1) while installed and (2) while temporarily removed until replacement has commenced; also tools and equipment in the aircraft which have been designed for use with the aircraft and are ordinarily carried therein.

*"Airport Premises"* means such portions of airports and buildings thereon as are used by the *Insured* in connection with the operation or maintenance of the *aircraft.*

*"Bodily Injury"* means bodily injury, sickness, disease and mental anguish sustained by any person which occurs during the policy period, including death at any time resulting therefrom; also assault and battery, false arrest, detention or imprisonment, but only when any such offense is committed by a *crew* member of an *aircraft* insured hereunder in the interest of safety of such *aircraft* or its occupants.

*"Crew"* means any person such as the *pilot in command*, co-pilot, flight engineer or flight attendant who is in, on or boarding the *aircraft* for the purpose of assisting in the operation of the *aircraft* or alighting therefrom after a ride, *flight* or attempted *flight* therein.

*"Disappearance"* means missing and not reported for thirty (30) days after the commencement of a *flight.*

*"Federal Aviation Administration"* means the duly constituted authority of the United States of America having jurisdiction over civil aviation, or its duly constituted equivalent in any other country.

*"First Named Insured"* means the person or organization first named in Item 1.(a) of the Declarations.

*"Flight"* means (1) with respect to fixed wing aircraft, from the time commencing with the actual takeoff run until the aircraft has completed its landing roll and (2) with respect to rotorcraft, from the time the rotors start to revolve under power for the purpose of becoming airborne until they cease to revolve after landing.

*"In Motion"* means while the aircraft is moving under its own power or the momentum generated therefrom or while it is in *flight* and, if the aircraft is a rotorcraft, any time that the rotors are rotating.

*"Insured"*. The unqualified word "Insured" means, (1) with respect to all Coverages, the *Named Insured* and (2) with respect to Part I - LIABILITY COVERAGES - (a) any person while using the *aircraft* with the permission of the *Named Insured* provided the actual use is within the scope of such permission and (b) any other person or organization, but only with respect to that person's or organization's liability because of acts or omissions of the *Named Insured* or of an *Insured* under (a) above, provided, however, that the insurance afforded under sub-sections (2) (a) and (b) above does not apply to:

(i)     any person or organization, or agent or employee thereof (other than employees of the *Named Insured*) engaged in the manufacture, maintenance, repair, or sale of aircraft, aircraft engines, components or accessories, or in the operation of any airport, hangar, flying school, flight service, or aircraft or piloting service, with respect to any *occurrence* arising out of such activity, or


GLOBAL AEROSPACE

## POLICY DEFINITIONS - GENERAL (Continued)

(ii)   the owner or lessor, or any agent or employee thereof, of any *aircraft* which is the subject of the extended insurance provisions of Coverage B or C.

"*Insured Value*" means the Insured Value of the *aircraft* as set forth in Item 4. of the Declarations.

"*Medical Expenses*" means expenses for necessary medical, surgical, x-ray and dental services, including prosthetic devices, and necessary ambulance, hospital, professional nursing and funeral services.

"*Military or Governmental Agreement*" means a written hold harmless agreement required by a military or governmental authority as a prerequisite to the use of an airport or an airport facility, in which the *Named Insured* agrees to assume the liability of others for *bodily injury* or *property damage*.

"*Mobile Equipment*" mean a vehicle, including any special use vehicle designed for the maintenance, servicing or handling of *aircraft*, which is maintained for use primarily on or next to *airport premises*, provided it is not registered under a motor vehicle registration law for use on public roads.

"*Named Insured*" means:

(a)   the person(s) or organization(s) named in Item 1.(a) of the Declarations.

(b)   any organization newly formed or acquired by the person(s) or organization(s) named in Item 1.(a) of the Declarations, other than a partnership, joint venture or limited liability company, and over which the person(s) or organization(s) named in Item 1.(a) of the Declarations maintains ownership or majority interest, provided there is no other similar insurance available to that organization. However:

   (i)   coverage under this provision is afforded only until the 60th day after the organization is formed or acquired or until the end of the policy period, whichever is earlier; and

   (ii)   Part I Coverages do not apply to *bodily injury* or *property damage* that occurred before the organization was formed or acquired.

(c)   Any person or organization named in an aircraft management agreement with the *first Named Insured* will also qualify as a Named Insured provided the aircraft to be managed under the agreement is either described in a Managed Aircraft Schedule attached to this policy or qualifies under paragraph 2. of POLICY CONDITIONS - GENERAL.

"*Non-Owned Aircraft*" means any aircraft other than:

(a)   *aircraft* described in Item 4. of the Declarations;

(b)   aircraft owned in whole or in part by or registered in the name of the *Named Insured*;

(c)   aircraft for which insurance is provided under Coverage B;

(d)   aircraft having a seating capacity in excess of forty (40) total seats; and

(e)   aircraft which are the subject of a lease or service agreement with the *Named Insured* or any aircraft management agreement with the *first Named Insured* for a period in excess of thirty (30) days unless such lease or service agreement or aircraft management agreement is reported to the Company and an additional premium is paid if required by the Company.



GLOBAL AEROSPACE

MEP (Rev. 01/01/2003)

## POLICY DEFINITIONS - GENERAL (Continued)

*"Occurrence"* means an accident, including continuous or repeated exposure to conditions, which results in *bodily injury* or *property damage* neither expected nor intended from the standpoint of the *Insured*, but this definition shall not be construed so as to preclude coverage for *bodily injury* or *property damage* resulting from efforts to prevent dangerous interference with the operation of the *aircraft*.

*"Partial Loss"* means any *physical damage* loss which is not a *total loss*.

*"Passenger"* means any person other than a *crew* member who is in, on or boarding the *aircraft* for the purpose of riding or flying therein, or alighting therefrom after a ride, *flight* or attempted *flight* therein.

*"Physical Damage"* means direct and accidental physical loss of or damage to the *aircraft*, *spare engine*, *spare part* or *mechanics tools*, herein called loss, but does not include loss of use or any residual depreciation in value, if any, after repairs have been made.

*"Pilot In Command"* means the pilot responsible for the operation and safety of the *aircraft* during *flight*.

*"Pollutants"* means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

*"Property Damage"* means (a) physical injury to or destruction of tangible property which occurs during the policy period, including loss of use thereof at any time resulting therefrom, or (b) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an *occurrence* during the policy period.

*"Spare Engines"* means propulsion engines which have been or which are intended to be installed in an *aircraft* described in Item 4. of the Declarations and which are not included in the policy definition of *aircraft*.

*"Spare Parts"* means parts or accessories specifically designed for installation in an *aircraft* described in Item 4. of the Declarations and which are not included in the policy definition of *aircraft*.

*"Temporary Substitute Aircraft"* means any aircraft used in place of an *aircraft* described in Item 4. of the Declarations which is withdrawn from normal use other than:

(a)     *aircraft* described in Item 4. of the Declarations;

(b)     aircraft owned in whole or in part by or registered in the name of the *Named Insured*;

(c)     aircraft for which insurance is provided under Coverage C; and

(d)     aircraft having a seating capacity in excess of fifteen (15) total seats.

*"Total Loss"* means any *physical damage* loss for which the "cost to repair" will equal or exceed the *Insured Value* of the *aircraft* as defined herein. *Disappearance* or theft of the entire *aircraft* shall be considered a total loss.

# POLICY CONDITIONS - GENERAL

(Applicable to all Coverages unless superseded by the provisions set forth under Insuring Agreements)

1. **TERRITORIAL LIMITS**

   This policy applies only to *bodily injury* or *property damage* which occurs, and to *physical damage* losses to the *aircraft* which are sustained during the policy period, while the *aircraft* is anywhere in the world.

2. **AUTOMATIC INSURANCE FOR NEWLY ACQUIRED AIRCRAFT OR EQUIPMENT**

   (a)  **Newly Acquired Aircraft**

   If the *Named Insured* acquires an aircraft in addition to the *aircraft* described in Item 4. of the Declarations by way of a purchase or lease and within sixty (60) days thereafter reports such acquisition to the Company, then the insurance afforded by this policy shall apply to such additional aircraft as of the time of such acquisition, provided that there is no other similar insurance in effect on such acquisition date. If the *first Named Insured* acquires an aircraft in addition to the *aircraft* described in Item 4. of the Declarations by way of an aircraft management agreement and within sixty (60) days thereafter reports such acquisition to the Company, then the insurance afforded by this policy shall apply to such additional aircraft as of the time of such acquisition, provided that the aircraft management agreement places the responsibility for the procurement of insurance for such aircraft on the *first Named Insured* and there is no other similar insurance in effect on such acquisition date. Unless the *Named Insured* and the Company agree otherwise, the Coverages and Limits of Liability pertaining to said additional aircraft shall be the same as is provided for that *aircraft* which is described in Item 4. of the Declarations as having the greatest seating capacity, and the *Insured Value* of the additional aircraft shall be the actual cost of the aircraft to the *Named Insured.*

   (b)  **Increased Insured Value**

   In the event an *aircraft* described in Item 4. of the Declarations shall be modified or equipment should be installed or replaced therein, the *Insured Value* of the *aircraft* shall automatically increase to reflect the additional cost, if any, of such modification and/or installation, provided the *Named Insured* notifies the Company of such increase in the *Insured Value* within sixty (60) days following the completion of such modification and/or installation.

   With respect to paragraphs (a) and (b) above:

   (1)  The *Insured Value* of any one *aircraft* shall not exceed $15,000,000. unless otherwise approved by the Company, and

   (2)  The *first Named Insured* agrees to pay pro-rata additional premium at policy rates applied to the amount of any such acquisition or increased value.

3. **TWO OR MORE AIRCRAFT**

   When two (2) or more *aircraft* are insured under this policy, the terms of this policy shall apply separately to each.

## POLICY CONDITIONS - GENERAL (Continued)

### 4.  OTHER INSURANCE

Except with respect to insurance specifically purchased by the *Named Insured* to apply in excess of this policy, if there is other insurance in the *Insured's* name or otherwise, against loss, liability or expense covered by this policy, the Company shall not be liable under this policy for a greater proportion of such loss, liability or expense than the applicable limit of the Company's liability bears to the total applicable Limit of Liability of all valid and collectible insurance against such loss, liability or expense.

### 5.  INSURED'S DUTIES IN THE EVENT OF OCCURRENCE OR LOSS

(a)     In the event of an *occurrence* or loss, notice containing particulars sufficient to identify the *Insured* and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the *Insured* to Global Aerospace, Inc. as soon as reasonably possible. In the event of theft, robbery or pilferage the *Named Insured* shall also promptly give notice to the police.

(b)     If claim is made or suit is brought against the *Insured*, the *Insured* shall immediately forward to Global Aerospace, Inc. every demand, notice, summons or other process received by the *Insured* or any representative of the *Insured*.

(c)     The *Insured* shall cooperate with the Company and upon request shall assist in making settlements, in the conduct of suits and in enforcing any right of subrogation, contribution or indemnity against any person or organization who may be liable to the *Insured* because of loss, injury or damage with respect to which insurance is afforded under this policy; and the *Insured* shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The *Insured* shall not, except at the *Insured's* own cost, voluntarily make any payment, assume any obligation or incur any expenses other than for first aid to others at the time of an accident.

### 6.  ACTION AGAINST THE COMPANY

No action shall lie against the Company unless, as a condition precedent thereto, the *Insured* shall have fully complied with all of the terms of this policy.

With respect to Coverages under Part I, no action shall lie against the Company until the amount of the *Insured's* obligation to pay shall have been finally determined either by judgment against the *Insured* after actual trial or by written agreement of the *Insured*, the claimant and the Company.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the Company as a party to any action against the *Insured* to determine the *Insured's* liability, nor shall the Company be impleaded by the *Insured* or the *Insured's* legal representative. Bankruptcy or insolvency of the *Insured* or of the *Insured's* estate shall not relieve the Company of any of its obligations hereunder.

### 7.  CHANGES

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or stop the Company from asserting any right under the terms of this policy; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy signed by a duly authorized representative of Global Aerospace, Inc.


GLOBAL AEROSPACE